Frank **STAVROFF**, et al., Plaintiffs,

v.

Raymond D. **MEYO**, et al., Defendants.

Nos. 5:92 CV 2651, 5:92 CV 2681 and 5:92 CV 2695.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 14, 1995.

Robert Eric Kennedy, Marvin H. Schiff, Weisman, Goldberg, Weisman & Kaufman, Cleveland, OH, Richard S. Wayne, Allan J. Fossett, Strauss & Troy, Cincinnati, OH, Stephen T. Rodd, Abbey, Gardy & Squitieri, New York, NY, Gerald J. Rodos, Barrack, Rodos & Bacine, Philadelphia, PA, for Plaintiff.

Keith L. Carson, Daniel W. Hammer, Sr., Dena Marie Kobasic, Thompson, Hine & Flory, Cleveland, OH, for Defendant Raymond F. Meyo.

Steven A. Shaw, M. Lee Doane, *Howrey & Simon*, Washington, DC, Steven J. Roths-

child, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Defendant Dan R. Wipff.

Steven J. Rothschild, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, Daniel D. Domozick, Cleveland, OH, for Defendant Texlon Corp.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are the following motions for summary judgment: (1) the motion of Raymond D. Meyo (Docket No. 158); (2) the motion of Telxon Corporation (Docket No. 163); and (3) the motion of Dan R. Wipff (Docket No. 165). Plaintiffs have filed an extensive memorandum in opposition (Docket No. 172) and defendants have each filed a reply (Docket Nos. 179, 180, 182).[1] The Court conducted a hearing on the motions on August 24, 1995.[2] For the reasons discussed below, all three motions are granted.[3]

## I. BACKGROUND

### A. The Parties

Plaintiff Frank Stavroff ("Stavroff") purchased shares of Telxon common stock on September 8, 1992 (10,000 shares), September 9, 1992 (5,000 shares), and September 11, 1992 (20,000 shares). In his complaint filed on December 15, 1992, he alleges that, because of certain misrepresentations made by the defendants, he was damaged by his stock purchases.

Plaintiff James Walker ("Walker") purchased 1,800 shares of Telxon common stock during June of 1992. His complaint alleging damages was filed on December 17, 1992.

Plaintiff Jack Ebert ("Ebert") purchased 1,000 shares of Telxon common stock on December 8, 1992. His complaint alleging damages was filed on December 18, 1992.

Defendant Telxon Corporation ("Telxon") "designs, develops, manufactures, integrates, markets, and sells portable, batch and wireless, tele-transaction computers and systems[ ]" for use in bar code data capture applications. Telxon's products are found in "retail, industrial, transportation, logistics, insurance, financial, healthcare" and other industries. (Telxon Exh. 2, Docket No. 167). Telxon has a worldwide business.

Defendant Raymond D. Meyo ("Meyo") was President of Telxon from November, 1981 until October 14, 1992. He was also Telxon's Chief Executive Officer from May, 1985 through October 14, 1992.[4]

Defendant Dan R. Wipff ("Wipff") was, at all times relevant, Telxon's Chief Operating Officer and Chief Financial Officer. Plaintiffs allege that both Meyo and Wipff were insiders (Complaint, ¶ 8) and "control persons" (Complaint, ¶ 10).

### B. Plaintiffs' Claims

The three cases at issue here were originally filed separately on December 15, 1992 (Stavroff),[5] December 17, 1992 (Walker), and December 18, 1992 (Ebert). On February 1, 1993, with leave of Court, all three plaintiffs filed an Amended and Consolidated Class Action Complaint (hereafter, "Complaint") against Telxon, Meyo and Wipff. (Docket No. 22). On December 17, 1993, this Court certified class, with Stavroff, Walker and Ebert as class representatives, as follows:

---

1. Several of these documents, or exhibits in support thereof, have been filed under seal.

2. A transcript of the hearing has been filed (Docket No. 208).

3. Defendant Telxon Corporation has also filed a motion to strike experts' affidavits (Docket No. 177) and a motion to strike unauthenticated exhibits attached to plaintiff's memorandum in opposition (Docket No. 183). The Court did not rely upon any of the challenged affidavits or exhibits in making its decision. Therefore the motions are denied as moot.

In addition, plaintiffs have filed a motion for an order authorizing their counsel to provide notice to the class (Docket No. 194). Because of the disposition of the motions for summary judgment, this motion is also rendered moot and is, therefore, denied (Docket No. 194).

4. Meyo resigned his CEO position on October 14, 1992. The Chairman of Telxon's Board, Robert F. Meyerson ("Meyerson"), assumed the CEO position.

5. Another case was filed on this same day by Bruce Doniger (*Doniger v. Meyo, et al.*, Case No. 5:92 CV 2659). After all of the cases were consolidated, Doniger was withdrawn as a potential class representative.

**990**

All persons who purchased the common stock of Telxon between May 20, 1992 through December 14, 1992. [footnote omitted]. Excluded from the Class are the Defendants herein, members of the immediate family of each of the Individual Defendants, officers and directors of Telxon, any entity in which any Defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

(Memorandum Opinion and Order, December 17, 1993, Docket No. 97).[6]

The gravamen of plaintiffs' claim is found in the very first paragraph of the Complaint, which alleges:

1. . . . During the Class Period, Defendants caused or permitted Telxon and certain of its directors and officers and certain securities analysts to issue positive public statements, and failed to timely correct prior overly optimistic statements, in press releases and in other documents, including reports filed with the Securities and Exchange Commission ("SEC") regarding Telxon, its finances, management, earnings, future business prospects and products to the effect that Telxon was enjoying strong demand for its products, was achieving strong and growing sales, all of which would result in continued growth in sales, income and earnings per share in fiscal 1993. By making and/or conspiring to make such statements, Defendants further engaged in acts, practices and devices which operated as a scheme or artifice to defraud Plaintiffs and the members of the Class herein defined. Defendants knew or recklessly disregarded the fact that these representations, omissions and wrongful actions would artificially inflate and/or prevent the decline in value of Telxon's stock during the Class Period, thereby allowing certain of Telxon's insiders, including Defendants Meyo and Wipff, to reap over one million dollars in proceeds from insider sales of more than 60,000 shares of Telxon's stock prior to the revelations of December 14, 1992—that the Company expects a consolidated loss or at best to break even for the fiscal year ending

March 31, 1993 and that consolidated revenues will be in the range of $235 to $242 million. This is a reduction from the Company's previous announcement that it expected revenues in the range of $255 to $265 million and earnings of $1.15 a share to $1.20 per share.

(Complaint, ¶ 1). Plaintiffs further allege that defendants "knew or should have known" that positive statements "which indicated that [Telxon] would achieve strong and continued growth in revenues and profits for [the] fiscal year ended March 31, 1993, . . . [had no] reasonable basis in fact." (Complaint, ¶ 2).[7]

Plaintiffs allege that Meyo and Wipff ("the Individual Defendants") engaged in a course of conduct designed to "influence and inflate the price that Plaintiffs and other investors paid for Telxon common stock" (Complaint, ¶ 12) "so that some of the Individual Defendants could sell their personal holdings in Telxon at artificially inflated prices" (Complaint, ¶ 13).

Plaintiffs' Complaint asserts two causes of action based on the same factual allegations: (1) violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and of Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder; and (2) a state law claim for negligent misrepresentation.

The crux of plaintiffs' securities law claim lies in the allegation that the defendants, knowing that Telxon was not doing as well as anticipated, nonetheless continued to tout record-breaking statistics and failed to timely correct the resulting public perception that Telxon was financially healthy. Plaintiffs assert that this course of action was taken, at least in part, to permit Meyo and Wipff to divest themselves of about 60,000 shares of stock. Plaintiffs claim that, because of this fraud on the market, they and others like them who purchased Telxon stock suffered financial injury when the stock's value dropped.

---

6. No notice to the class has been given, pending resolution of the motions for summary judgment.

7. The Complaint has two paragraphs numbered "2;" this quotation is from the second paragraph 2.

The facts supporting plaintiffs' claim can be summarized as follows. On May 20, 1992, defendants issued a press release reporting record earnings and revenues for the fourth quarter of fiscal year 1992 ("FY92") and for that entire fiscal year. Telxon reported that its FY92 revenues were $215 million, up 16.5% from $184.6 million the prior fiscal year. In that same release, Meyo is reported to have stated that after-tax income had increased by more than 23% for the fourth quarter and by almost 30% for the year. He reportedly further stated that because of the growing demand for Telxon's systems solutions, he expected the momentum of record-setting performance to continue throughout FY93. (Complaint, ¶¶ 17, 19; Pl.Exh. 43).

On October 8, 1992, Telxon issued a press release in which it revised its earnings-per-share ("EPS") estimates for the second quarter of FY93 ending September 30, 1992. EPS estimates were revised downward from a range of $0.30 to $0.36 to a range of $0.24 to $0.28. (Complaint, ¶ 30; Pl.Exh. 98). Upon this news, the price of Telxon stock fell $3.10 per share. (Complaint, ¶ 30).

On October 9, 1992, Telxon issued another press release wherein Meyo reiterated his confidence in Telxon's long-term business outlook, even though he found it necessary to lower the forecast regarding revenues and EPS. Whereas the original forecast was for revenues in the range of $265 to $275 million, with EPS in the range of $1.35 to $1.45, the new forecast was for revenues in the range of $255 to $265 million with EPS of $1.15 to $1.20. (Complaint, ¶ 31; Pl.Exh. 99). Upon this news, the price of Telxon's stock fell from $17.000 to $13.375 per share. (Complaint, ¶ 31). Thereafter, however, it slowly continued to rise until, on December 11, 1992, it closed at $15.75 per share. (Complaint ¶ 32).

Finally, on December 14, 1992, Telson issued a press release stating that it expected financial results in the second half of FY93 to fall below previous revenue and earnings expectations of $255 to $265 million and $1.15 to $1.20 per share. The revised revenue estimates for FY93 were placed in the range of $235 to $242 million. Telxon attributed the decrease to lower-than-expected sales levels, increased marketing and product development expenses and one-time non-recur-

ring costs. The decline in sales was attributed to several factors, including the absence of large-volume sales to a single buyer, the decision to forego some very low gross margin sales and the Company's strategy to increase backlogs. (Complaint, ¶ 33; Pl.Exh. 110). In this press release, Meyerson, the new CEO since Meyo's resignation, announced a redirection of Telxon's resources "to produce more stable and predictable results to our shareholders." He also stated that, although certain new directions were necessary for the near term, Telxon was "taking steps to ensure that [it] will resume growth beginning in the second half of fiscal 1994." (Pl.Exh.110).

As this news was released, trading in Telxon stock was halted. (Complaint, ¶ 33). The next day, the first of the three lawsuits was filed in this Court.

On January 18, 1993, Telxon released its FY93 third quarter results, reporting a $0.63 loss per share compared to a $0.31 net income per share for the same period in FY92 and revenues of $48.9 million as compared to $53.2 million for the third quarter of FY92. (Complaint, ¶ 32; Pl.Exh. 112). Wipff was quoted as attributing the third quarter results to "non-recurring costs [ ] directly attributable to implementation of [Telxon's] new business strategy[.]" (Pl.Exh. 112). He also noted that, excluding these unusual items, operating income was at an approximate break-even level for the quarter.

Plaintiffs also allege that defendants made other misleading public statements, including statements made in public filings. On June 17, 1992, Telxon filed its 1992 Form 10–K with the SEC and also issued its 1992 Annual Report to Shareholders. In both, Telxon reported a 17% increase in revenues for FY92 over FY91 and stated its expectation of a comparable increase in consolidated revenues for FY93 over FY92. (Complaint, ¶¶ 22–25; Pl.Exhs. 15, 70).

On August 17, 1992, Telxon filed with the SEC its Form 10–Q quarterly report for the period ending June 30, 1992. It reported a 37.4% increase in consolidated revenues for that quarter and stated that it anticipated for FY93 that consolidated revenues would in-

crease in excess of 20% over FY92. (Complaint, ¶ 27; Pl.Exh. 89).

Plaintiffs further claim that several analysts who followed Telxon during this time period issued various reports estimating revenues and earnings growth for FY93. These positive reports were allegedly influenced by the purportedly false and misleading statements made by the defendants and caused the price of Telxon stock to artificially inflate, a fact which operated to the benefit of Meyo and Wipff when they divested themselves of some of their Telxon holdings. (Complaint, ¶¶ 12–13, 29).

Finally, plaintiffs assert that all of these positive predictions, reports and press releases were made, and subsequently not timely corrected or updated, despite defendants' knowledge of various negative factors, namely: weakness in the gross profit margin, weakness in European sales, unusual price competition in the United States, a strategy to forego sales and increase backlogs, and a one-time non-recurring cost in FY93.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). See, e.g., U.S. v. Hodges X–Ray, Inc., 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S.Ct. at 2553, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves ...." Celotex Corp. v. Catrett, 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." See Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 968–69 (6th Cir.1991) (quoting State Mutual Life Assurance Co. v. Deer Creek Park, 612 F.2d 259, 264 (6th Cir.1979) and citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1609 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir.1986) (citing Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. at 2510. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. Anderson v. Liberty Lobby, 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2553 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511.

### III. DISCUSSION

#### A. Securities Fraud Claim (Count I)

##### 1. Applicable Law

Section 10(b) of the SEC makes it unlawful to:

use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5, promulgated pursuant to Section 10(b), makes it unlawful for any person to:

... make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...

17 C.F.R. § 240.10b–5. It is well settled that Section 10(b) and Rule 10b–5 provide a private right of action. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

To prevail on a securities fraud claim, a plaintiff must show that defendant: (1) made a misstatement or omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which plaintiff relied;[8] and (6) that such reliance proximately caused plaintiff's injury. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir.1991).

Under its rulemaking authority, the SEC imposes affirmative obligations to disclose specific information in periodic reports. *See* 15 U.S.C. §§ 78l, 78m, 78o. Liability may be imposed where a materially false or misleading statement or omission in a report filed with the SEC is made or omitted with scienter. "Mere mismanagement or inaccurate predictions are not enough [to establish a securities fraud claim]." *Auslender v. Energy Management Corp.*, 832 F.2d 354, 357 (6th Cir.1987). In addition, although silence is not misleading in the absence of a duty to disclose, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988), if a corporation makes a public statement which is reasonably expected to influence the investing public, there is an obligation to disclose sufficient information to prevent the statement from being misleading. *SEC v. Texas Gulf Sulphur Co.*,

---

**8.** In this case, plaintiffs are asserting a "fraud on the market" theory; therefore, no individual reliance need be proven. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir.1986).

401 F.2d 833, 862 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Thus, the question becomes whether the statements made in public filings or in press releases were true and complete enough so as not to be misleading.

■ In general, the SEC does not require disclosure of "soft information." Soft information is defined as "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts." *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 642 (3d Cir.1989). However, if statements regarding such information are made, they are not necessarily exempt from the anti-fraud provisions of the federal securities laws.

The Sixth Circuit has spoken directly regarding forward-looking statements:

Economic projections are not actionable if they bespeak caution. *Polin v. Conductron Corp.,* 552 F.2d 797, 806 n. 28 (8th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). When a corporation, through its officers or otherwise, states an honestly held view based on the information currently before it, neither it nor its officers may be held liable pursuant to section 10(b) or Rule 10(b)(5) [sic]. *See Schwartz v. Novo Industri, A/S,* 658 F.Supp. 795, 799 (S.D.N.Y.1987) (holding corporation or officers liable would constitute action for "fraud by hindsight"). In determining whether the statements are actionable, the court must scrutinize the nature of the statement to determine whether the statement was false when made. *See Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 204 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). **While analyzing the nature of the statement, the court must emphasize whether the "prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis."** *Id.*

*Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991) (emphasis added); *see also Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir.1993) (material statements containing the speaker's opinion are not actionable if the speaker believes the opinion and the opinion is factually well-grounded). Thus,

forward-looking statements made by a company and/or its officers or representatives are not actionable if they meet the *Sinay* test.

### 2. Application of the Law to the Facts

#### (a) Allegations Leveled Against All Three Defendants

■ Plaintiffs are essentially challenging the various forward-looking statements made by the defendants in press releases and SEC filings. Plaintiffs assert that the statements were misleading to the investing public because of omissions of material facts relating to several subjects:

(1) Telxon's failure to disclose that it was experiencing a deterioration in its core business (i.e., business exclusive of the over $20 million February 1992 Wal–Mart contract, an incremental one-time-only contract) (Exh. 16, T10379–T10384);

(2) Telxon's failure to disclose it had no sizeable backlog of sales orders after the Wal–Mart contract (*Id.*);

(3) Telxon's failure to disclose that the Wal–Mart contract did not result in significant large referral orders (*Id.*);

(4) Telxon's failure to disclose that it was unable to secure adequate business from new customers (*Id.*);

(5) Telxon's failure to disclose that its ability to meet revenue and/or earnings goals in the first and second quarters of fiscal 1993 was, in large part, due to the manipulation of shipments and billing to Wal–Mart and a "bill-and-hold" strategy with one of its customers, NPD Nielsen, (whereby Telxon would bill Nielsen and record revenue during the first quarter for products held at Telxon and not actually delivered until the second quarter)(Gavron Aff. 33–51);

(6) Telxon's failure to disclose that its increased production and warranty costs made it impossible to accurately estimate expenses and profit margins (Exh. 23, T05124, 5154–56; Exh. 24, T05170, 5200–05; Exh. 25, T05238, 5269–73; Exh. 26, T05306, 5337–43; Exh. 27, T05437, 5467–74; Exh. 28, T05508, 5538–41; Exh. 29, T05642, 5668–75); and

(7) Telxon's failure to disclose that the used merchandise inventory returned by Wal–Mart was carried as a valuable asset on the books of Telxon, even though Telxon knew it was obsolete and had little or no value. (Gavron Aff. at 7–32; Exh. 32, Tocher Dep., at 37–38).

(Plaintiffs' Memorandum in Opposition, Docket No. 172, pp. 4–5, footnotes omitted).

Upon examination of the various public statements made by the defendants, it is apparent that, contrary to plaintiffs' assertions, Telxon's public statements survive scrutiny under *Sinay*.

First, the statements expressed honestly-held beliefs supported by historical and factual bases. Taking all of the press releases and SEC filings into consideration, the range of growth projected by Telxon for FY93 was 16.5% to 23% over FY92 revenues. Historically speaking, Telxon had increased its annual revenues by more than 20% six times before the Class Period. Gerald Gabriel, Telxon's Corporate Controller, submitted an uncontroverted affidavit stating that the years and percentages of increase were as follows: 1985 (54 .3%); 1986 (28.2%); 1987 (22.8%); 1988 (22.9%); 1989 (28.9%); and 1991 (28.7%). Gabriel also testified that, five times before the Class Period, Telxon had increased its annual earnings per share as follows: 1985(57%); 1986(41%); 1987(47%); 1991 (184%); and 1992(24%). In the fiscal year prior to the Class Period, Telxon increased its revenues by 16.5% and its earnings by 24%. (Gabriel Aff., ¶ 4).[9] Thus, Telxon's historical pattern of growth provided a basis for the public projections of 16.5% to 23% growth.

Besides the historical basis for its prediction, Telxon also had contemporaneous factual bases for the public statements. For example, anyone can do the math computation to determine that statements made comparing FY92 to FY91 were factually correct. Revenues for FY91 were $184.6 million and for FY92 they were $215 million. This is an increase of $30.4 million dollars, or 16.5%, over FY91.[10] This is simply a fact. Based on its consistent history of revenue increases since 1985, there was a factual and historical

basis for Meyo to predict that the momentum would continue through FY93.

The other public statements and filings made by Telxon are similarly supportable by the facts and some simple computations. To the extent that Telxon may have "predicted" a positive outlook, its recent past performance provided a reasonable basis for such predictions. Further, these predictions based on current financial status interpreted in light of past performance cannot be seen as promises that any particular result would definitely occur.

Notwithstanding the historical and factual basis for the prediction of an approximate 20% increase, management nonetheless made certain cautionary statements which were reported by various analysts. As a result, the "total mix" of information available to the market included disclosures regarding several weaknesses, for example:

(1) On January 20, 1992, Shearson Lehman Brothers noted that "Telxon *continued* to stress the competitive pricing environment." (Wipff Exh. 11).

(2) On January 21, 1992, McDonald & Company reported a reduced EPS estimate, citing "weaker than expected demand patterns in Europe[.]" (Wipff Exh. 13).

(3) On February 3, 1992, McDonald & Company reported that "recession induced price pressures" had depressed Telxon's profit margins. (Wipff Exh. 8).

(4) On February 6, 1992, Shearson Lehman Brothers reported that "Telxon points out that the market remains competitive[.]" (Wipff Exh. 14).

(5) On March 6, 1992, The Ohio Company lowered its FY92 EPS, citing concern about a slow European economy. (Wipff Exh. 15).

(6) On May 21, 1992, following a meeting with Telxon management, Shearson Lehman Brothers warned that since Wal–Mart business is concentrated in the first half of the year, "the risk level in EPS and the stock is increased somewhat[.]" (Pl. Exh.63).

---

**9.** The Gabriel Affidavit is found among defendant Telxon's exhibits (Docket No. 167, Exh. 3).

**10.** (($215,000,000 − $184,600,000) ÷ 184,600,000) × 100 = 16 .46803%

(7) On May 22, 1992, The Ohio Company issued a report wherein it noted a "competitive pricing environment brought on by slowing economies in the U.S. and Europe[.]" It further noted that Telxon's "[p]roduct gross margins have slipped in the quarter compared to a year ago." (Pl. Exh.64).

(8) On May 27, 1992, McDonald & Company met with Telxon management to discuss current outlook. Telxon stated it was "comfortable" with McDonald's FY93 EPS estimate of $1.50, but McDonald acknowledged it was "at the high end of the Street's $1.30–$1.50." (Pl.Exh.65).

(9) On June 18, 1992, William Blair & Co. reported that Telxon's management had warned that "sharp pricing on the Wal–Mart contract" would depress gross margins in the first and second quarters of FY93. (Pl.Exh.76).

(10) On June 23, 1992, Shearson Lehman Brothers reported that "Telxon management has cautioned the Street on gross margins during the Wal–Mart rollout[.]" (Pl.Exh.75).

(11) On June 30, 1992, an analyst's report noted that Telxon's "management expressed their discomfort over" the "Street's" earnings estimates. (Wipff's Exh. 17).

(12) On September 24, 1992, a Robinson–Humphrey Equity Research Report noted "competitive pricing pressures." (Wipff Exh.10).

(13) On October 8, 1992, Shearson Lehman Brothers reported that "Telxon management ... made some comments which we interpreted as cautionary regarding near term business." It also reported that "[m]anagement cites domestic price competition and 'apprehension' about European sales for a slightly less robust outlook for the December quarter." The report stated: "It is very possible that management is taking an ultra-conservative stance vis-a-vis the Street to be sure that it doesn't disappoint." (Pl.Exh.11).

When facts have been publicly disclosed by an analyst or other person, the company itself need not repeat the disclosure. *See, e.g., Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993) (negative press reports "fully apprised" the market of the fact that was allegedly omitted); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) (information can be made available from "other sources"); *Steiner v. Tektronix, Inc.*, 817 F.Supp. 867, 880–82 (D.Or.1992) (disclosures made in analyst reports).[11]

Plaintiffs have combed through volumes of discovery materials and have put together a scenario attempting to show that defendants knew all along, or at least well in advance of their December 14, 1992 press release, many facts which would suggest that Telxon was not financially sound. In particular, plaintiffs rely on certain of Telxon's internal forecasting tools—namely, the Budget, the Quota and the Build Plan—to support their assertion that Telxon knew it was not doing as well as projected but failed to disclose that fact to the public. However, as well-articulated in the defendants' briefs and at the hearing on the motions, these documents are mere planning tools for internal use only. They are not released to the public and they typically reflect "goals" which exceed the public projections.

Several key players in Telxon's budgeting process gave deposition and affidavit testimony as to the process used to created the Budget: (1) Roger Murphy, Telxon's Director of Financial Analysis; (2) Gerald Gabriel, the Corporate Controller; and, (3) Raymond Meyo, the former CEO. They all testified that budget preparation was a dynamic process which consisted of an ongoing "give-and-take." Once the Budget was prepared, it was not revised, notwithstanding actual results throughout the fiscal year. For FY93, the revenue goal was set at 5271.8 million, with earnings of $ 1.54, increases of

---

**11.** Although plaintiffs also complain that defendants failed to disclose a strategy to forego sales and increase backlog as well as a one-time non-recurring cost in FY93, these claims have no merit and need not be addressed. These matters did not become issues until *after* Meyo resigned on October 14, 1992. His severance package was the one-time non-recurring cost. The strategy to forego sales and increase backlog, decided upon after Meyo resigned, was announced sometime around the middle of December, the earliest it could have been announced.

26.4% and 36%, respectively, over FY92.[12] (Telxon Exh. 4, Murphy Dep., pp. 23–38; Telxon Exh. 5, Gabriel Dep., pp. 16–20; Telxon Exh. 6, Meyo Dep., pp. 53–66; Telxon Exh. 3, Gabriel Aff.; Telxon Exh. 7, FY93 Budget). The Budget was not released to the public. Therefore it cannot form the basis for any claim of being misled by public information.

Telxon's Quota was a management tool whereby senior management set revenue goals for each salesperson. The Quota for FY93 was $279 million, representing an almost 30% increase over FY92 revenues.[13] This was also $8 million over the actual FY93 Budget revenue goal of $271.8 million. The Quota was not released to the public and was used only internally. (Telxon Exh. 6, Meyo Dep., pp. 63, 89–91).

Telxon's Build Plan was a tool used to direct the Houston–Telxon Manufacturing Facility regarding what product mix to build and what materials to order to support the manufacturing process. (Telxon Exh. 8, Sides Dep., pp. 11–14).[14] The Build Plan was prepared in part from the National Sales Forecast, which was a document showing each salesperson's own forecast regarding how much product he or she anticipated selling. Following completion of the National Sales Forecast, the Build Plan was finalized by way of a series of Sales and Operation Planning Meetings. It was thereafter revised monthly to integrate changes in anticipated needs, customer demands and varying component part inventory levels. (*Id.*).[15] The Build Plan typically represented only about 60% of consolidated revenues. The FY93 Build Plan represented consolidated revenues of $303 million, a 41% increase over FY92 revenues.[16] The Build Plan, like the Budget and the Quota, was an internal document not released to the public.

Because the Quota and the Build Plan were internal documents not intended for public release, they were working documents, that is, they could be and were modified as conditions changed. The revenue goals in these two documents typically exceeded the Budget revenue goal which, in turn, exceeded public projections. Plaintiffs' reliance on the fact that Telxon failed to meet the goals set forth in the FY93 Budget, Quota and Build Plan as proof of an intent to deceive the market is simply incorrect. The fact that Telxon did not meet the goals in these three documents cannot be interpreted to mean that it knew it would not meet its decidedly lower public projections ranging from 16.5% to 23%, projections which had a reasonable basis in history and fact.

Plaintiffs also place considerable emphasis on reports created by Telxon's Order Entry Department. These reports are known as "Revenue Recaps." They are generated several times each week and generally contain a

---

12. Revenues and EPS figures for FY92 can be found in the 1992 Annual Report to Shareholders. (Telxon Exh. 20). From there, the percentages can be ascertained by simple calculations. The calculation for revenues is: $((\$271,800,000 - 215,000,000) \div 215,000,000) \times 100 = 26.4186\%$. The calculation for EPS is: $((\$1.54 - 1.13) \div 1.13) \times 100 = 36.2831\%$.

13. $((\$279,000,000 - 215,000,000) \div 215,000,000) \times 100 = 29.7674\%$

14. Telxon builds products from direct customer orders only. It does not build to store in inventory. Each customer can select any number of options, e.g., modems, memory sizes, which are then built by Houston into the precise product ordered by that customer. (Telxon Exh. 8, Sides Dep., p. 13). The Build Plan is supposed to provide for enough component parts to be kept on hand so that any customer order can be filled relatively rapidly, without a backlog of orders building up. It appears that, under Meyo at least, Telxon prided itself in rapid response to customer orders. This "low-backlog" philosophy was one of the business strategies that Meyerson changed when he took over as CEO. Obviously, a larger backlog of orders would permit more precise inventory control and would help keep costs down. It also would help spread the work out more evenly over a given month and quarter. In his affidavit, Gerald Gabriel stated that Telxon historically shipped a significant amount of its quarterly business during the last five days of the quarter. (Telxon Exh. 3, Gabriel Aff., ¶ 6). At the hearing, Telxon's counsel described this as a kind of "game of chicken between the buyers and sellers, where the sellers are trying to achieve the highest margin and the buyers are waiting to the end of the quarter so they can put the most pressure on the seller of the equipment." (Transcript of Hearing, p. 14).

15. The Court notes that throughout the cited pages of the Sides Deposition, the Build Plan is incorrectly transcribed as "bill plan."

16. $((\$303,000,000 - 215,000,000) \div 215,000,000) \times 100 = 40.9302\%$

monthly breakdown of orders and potential orders for domestic hardware. The Revenue Recaps contain a figure referred to as a "goal;" however, this "goal" is a fluctuating internal target that exceeds the comparable Budget goal. The Revenue Recap "goal" is used as a motivational target for the sales force. It is not communicated to the public. Further, during the first and second quarters of FY93, the actual results of the Revenue Recaps were grossly understated because they did not contain the domestic hardware sales to Wal–Mart.[17] (Telxon Exh. 50, DeLamatter Aff.).[18] A failure to meet the "goal" indicated in any or all of the Revenue Recaps cannot be interpreted as proof that Telxon knew it would not meet its public projections. In fact, actual domestic hardware results for the first two quarters of FY93 exceeded public projections of growth. (Telxon Exh. 46, Gabriel Aff.).

In the recent unpublished decision of *In re Royal Appliance Sec. Litig.*, 64 F.3d 663, 1995 WL 490131 (6th Cir.1995), a case arising out of this district, the Sixth Circuit addressed claims similar to plaintiffs' claims. Because the case is so similar, it will be discussed at length.

In *Royal*, shareholders of Royal Appliance, Inc. filed a consolidated class action suit against Royal and its officers alleging claims of securities fraud and negligent misrepresentation based on assertions that prices were inflated because of material misrepresentations and omissions regarding the company's 1992 economic projections. The district court had granted defendants' motion to dismiss, finding that Royal's general projections of future success were immaterial and that the specific projections of future success were not actionable under the "bespeaks caution" doctrine. The Sixth Circuit affirmed the decision.

The *Royal* plaintiffs had alleged

"fraud on the market" in that the defendants made optimistic 1992 sales and growth predictions while omitting the following allegedly material, misleading facts, which they knew or recklessly disregarded: (1) advertising and promotional expenses were expected to and did substantially increase; (2) high levels of overhead were unabsorbed based on the inefficient operating of two new plants; (3) new product lines had lower gross margins; and (4) April and May earnings figures were off-target, and, thus, annual projections would be off-target.

*In re Royal Appliance Sec. Litig.*, 64 F.3d 663, 1995 WL 490131 at * 3.

The Sixth Circuit upheld the district court's finding that the defendants' vague, optimistic statements were not material.

Allegations that a company engaged in general puffery is [sic] insufficient to claim securities fraud. *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993). "Soft," "puffing" statements ... generally lack materiality because the market price of the share is not inflated by vague statements predicting growth. The whole discussion of growth is plainly by way of loose prediction.... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market. *Id.* at 289–90 (citations omitted). The bulk of defendants' alleged misrepresentations, such as "Royal [is] on track to have a terrific year," were properly dismissed as puffery. *Id.* (ellipses in original).

The Sixth Circuit also analyzed the district court's dismissal under the "bespeaks caution" doctrine of *Sinay v. Lamson & Sessions Co., supra*, although it noted that the representations dismissed under this doctrine could also have been dismissed as puffery based on *Raab*.[19]

---

17. On or about February 13, 1992, Telxon secured the prized Wal–Mart contract. The Wal–Mart contract would provide high revenue but low-to-negative profit margin. (Pl.Exh. 32, Tocher Dep., at 39–40). However, it was expected to generate sales from other retailers who would follow Wal–Mart's lead in selecting Telxon.

18. Donna DeLamatter was Telxon's Vice President of Order Entry during FY92 to FY93. (DeLamatter Dep., ¶ 1).

19. The Sixth Circuit noted in a footnote:
For example, some of the dismissed claims in *Raab* were based on an asserted "failure to disclose the adverse impact of [a] contracting slowdown on first quarter 1992 earnings," and on predictions that "results during the remainder of 1992 should be in line with analysts'

Under the "Bespeaks Caution" doctrine, an optimistic, concrete prediction is immaterial if it is sufficiently accompanied by cautionary language. *Mayer*, 988 F.2d at 639; *Sinay*, 948 F.2d at 1040. "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3d Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). As the Supreme Court explained, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 2760, 115 L.Ed.2d 929 (1991). Application of this doctrine requires the court to assess the communications at issue on a case-by-case basis. *In re Trump*, 7 F.3d at 371.

*Id.* The *Royal* plaintiffs argued before the Circuit that it was error for the district court to find that there was sufficient cautionary language in these statements made by the defendants:

(1) On March 4, 1992, at a meeting with securities analysts in Cleveland, Balch stated that: (a) Royal expected 1992 to be "another year of rapid growth, with both sales and earnings rising 25%–30%"; (b) he was "comfortable with analyst earning estimates in the range of $2.80 a share for 1992 which was $.63 more a share than the $2.17 the company had reported for 1991"; and (c) Royal's 1992 sales would reach $350 million (or $77 million more than the $273 million reported for 1991). Balch also noted that he "expect[ed] future growth to come from product line expansion, heavy advertising spending and further market expansion."

(2) At a June 9, 1992, presentation to investors, Balch reiterated that "We're comfortable with [analyst's estimates of Royal's 1992 net income of $2.80 per share]." He "cautioned that the company's profits might not rise in proportion to its sales. . . . He said the cost of product introduction and advertising, particularly in the fourth quarter, could cut into profit margins."

(3) On June 24, 1992, Balch, in a public broadcast television interview, was asked whether Royal's revenues and profits could realistically grow at an annual rate of 25% to 30%. He replied, "Yeah. That's probably alright." Balch added: "That depends a lot again on how Christmas goes each year. You know the fourth quarter is really a big one for us. And that little Hand–Vac and everything else for that matter, it's really hard to tell. A lot depends on retailers, how many of those guys left out there that haven't filed Chapter 11. You know, we went through that period where we had a lot of really unhealthy folks."

*Id.* at \*4. The Sixth Circuit affirmed the dismissal of these representations as containing sufficient cautionary language. The court also concluded "that any specific omissions, including April and May's purportedly low numbers, would also be immaterial." *Id.* citing *Saltzberg v. TM Sterling/Austin Associates, Ltd.*, 45 F.3d 399, 400 (11th Cir.1995) (cautionary statements rendered alleged omissions or misrepresentations immaterial); *In re Trump*, 7 F.3d at 370–77 (specific disclosures of assumptions and industry risks rendered optimistic projections and failure to disclose certain information immaterial as a matter of law); *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 949 F.2d 243, 245 (8th Cir.1991) (feasibility study contained no actionable omission or misstatement because of specific cautionary language and risk statements).

---

current projections," and that "an expected annual growth rate of 10% to 30% over the next several years" with resulting "growth and success" would continue "well into the future." 4 F.3d at 288–91. *Accord Malone v. Microdyne Corp.*, 26 F.3d 471, 479–80 (4th Cir.1994) (prediction not actionable where company president stated that he was "com-

fortable with" analyst's earnings estimate of 80 cents per share in 1992 fiscal year, and $1.05 per share in 1993 fiscal year). *Royal*, 1995 WL 490131, at \*3, n. 1. Some of these predictions, which the Sixth Circuit noted with approval were dismissed in *Raab*, are remarkably close to the predictions attacked by plaintiffs in the instant case.

In the instant case, the alleged misrepresentations made by the defendants are very similar to those discussed in *Royal* and *Raab*. Some are puffery; some are true because based on actual facts; some contain sufficient cautionary language. To the extent plaintiffs argue that certain omissions rendered the public statements misleading, this Court is of the view that plaintiffs have merely put together a mosaic of unrelated pieces attempting to create a picture of "fraud by hindsight." In doing so, plaintiffs have often relied on data that was never intended to be used as plaintiffs are using them and have further complicated their analysis by drawing unsupportable inferences from those data. Plaintiffs have simply presented no evidence to support a claim that the defendants intended to mislead the market or that their public statements were false or misleading when made.

### (b) Allegations Leveled Against the Individual Defendants

■ Plaintiffs' claims that the alleged fraud on the market was engaged in, at least in part, to permit Meyo and Wipff to divest themselves of 60,000 shares of Telxon common stock before the bad news hit is equally unsupportable. Both defendants have submitted that they routinely sold shares of stock as a form of personal income. This evidence is completely uncontroverted.

At the beginning of the class period, Meyo (and his family) owned more Telxon stock than any of its other officers or directors. Meyo had 86,507 shares in his own name. Members of his family held an 43,005 shares and Meyo had options to acquire an additional 175,676 shares. (Meyo Exh. D, Meyo Aff., ¶ 3).

During the class period, Meyo acquired a total of 25,006 shares of Telxon stock through exercise of options. (*Id.,* ¶ 4) During the class period, Meyo also sold a total of 27,422 shares. Meyo's gross (before-tax) profit from the acquisition and sales was $40,983.00. (*Id.,* ¶ 5).

When the value of Telxon's stock fell, the value of Meyo's holdings, in turn, declined by $558,557.25. In addition, he was forced to resign his lucrative CEO position, where he earned base compensation of $600,000 plus bonuses. His compensation plus bonuses for 1992 alone was $921,000. (Meyo Exh. G., Proxy Statement, at 7). In addition, he was party to an Employment Agreement with Telxon which guaranteed him compensation of at least $600,000 for both 1993 and 1994, plus bonuses. (*Id.* at 8). Overall, Meyo suffered a very great loss when Telxon's stock declined in October of 1992.[20]

There is no evidence that Meyo engaged in trading "in suspicious amounts or at suspicious times" a fact which would be "probative of bad faith and scienter." *In re Apple Computer Securities Litigation,* 886 F.2d at 1117. In addition, any inference of insider trading is negated by Meyo's trading "consistent in timing and amount with a past pattern of sales[,]" *Freeman v. Decio,* 584 F.2d 186, 197 (7th Cir.1978), a fact that is evident from Meyo's Exhibit H, a chart depicting his historical pattern of sales. Furthermore, all of Meyo's sales during the class period were made after the public disclosures challenged by the plaintiffs.[21]

As regards Wipff's sales, in his affidavit he stated that he exercised his stock options as part of his compensation package on only two occasions during the class period, June 4,

20. Meyo's brief in support of his motion for summary judgment clearly sets forth the stakes involved:

> For over twenty years, Mr. Meyo—more than anyone else—had pushed, pulled, prodded, maneuvered and finessed Telxon from a struggling enterprise employing five people to a successful manufacturer employing over fourteen hundred people worldwide, with sales of over $200 million in fiscal year 1992. In the eight years preceding fiscal year 1992 alone (*i.e.,* since Telxon became a public company), sales grew from $41 million to $215 million, an increase of 525%. During that same peri-

od, net income grew from $2.9 million to $17 million, an increase of 586%. *See* Transcript of remarks of Robert E. Meyerson at the Annual Meeting of Shareholders of Telxon held August 19, 1992 (included as Exhibit B).

(Docket No. 158, at 4).

21. Following the class period and at a time when the price of Telxon stock was below even its lowest price during the class period, Meyo sold even more shares than he had sold during the class period. The fact that he sold even after the release of "bad news" is strong evidence that his stock sales were part of a planned disposition.

1992 and July 30, 1992. Both sales, were made at times that were consistent with Telxon's policy relating to when employees were permitted to trade. In particular, the first sale was made 14 days after Telxon announced it FY92 performance; the second sale was 13 days after Telxon announced its FY93 first quarter performance. Wipff stated that the options were exercised to pay accrued debts and that, after taxes and the payments of these debts, he actually experienced a loss of almost $39,000. (Wipff Exh. 6, Wipff Aff.).

Plaintiffs have provided no evidence whatsoever to suggest that Meyo's and Wipff's sales of stock and/or exercise of options were done in anything other than their usual planned fashion. There is no evidence of insider trading.

In view of this discussion, plaintiffs have failed to establish that there is any material factual dispute. Based on the undisputed facts in the record, defendants are all entitled to summary judgment on Count I of plaintiffs' Amended and Consolidated Class Action Complaint. Accordingly, to this extent all three motions for summary judgment are granted.

### B. Negligent Misrepresentation Claim (Count II)

Title 28, Section 1367(c)(3) provides that, where a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims. In the instant case, the Court has granted defendants' motions for summary judgment on the sole federal claim. Therefore, in its discretion, it could decline supplemental jurisdiction over the negligent misrepresentation claim and dismiss the same without prejudice. However, since the negligent misrepresentation claim is based on the same facts which have already been set forth at length, for the sake of judicial economy, the Court will exercise supplemental jurisdiction over this claim.

The Restatement (Second) of Torts § 552 (1977), provides:

(1) One who, in the course of his business, profession or employment, or in any transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

As a threshold matter, plaintiffs have not actually alleged that the public statements made by any of the defendants contained "false" information. The Complaint alleges as follows:

51. Defendants acted negligently, if not knowingly or recklessly, in making the misrepresentations described above and in failing to disclose material information to Plaintiffs and to the Class.

Apparently plaintiffs are asserting that the alleged "failure to disclose material information" rendered the public statements false, because they then allege:

52. At the time that Defendants were making the misrepresentations and were failing to disclose material facts, Plaintiffs and other class members were ignorant of the *falsity* of Defendants' representations. Plaintiffs relied upon the superior knowledge and expertise of Defendants and justifiably relied to their detriment on the misrepresentations and omissions of Defendants to the investing public. Had Plaintiffs and other members of the Class

been aware of the truth, they would not have purchased Telxon common stock at all, or would not have purchased stock at the prices which they paid. (emphasis added).

In fact, as discussed above, the public statements made by the defendants were not false when made and, as Meyo states in his affidavit, all of the statements were made with the good faith belief that anything said by way of projection or estimate had a factual and historical basis. Meyo further states that he believes to this day that, had he not been forced to resign, Telxon would have reached his projections. (Meyo Exh. D, Meyo Aff, ¶¶ 10–11).

Plaintiffs can point to no evidence in the record to refute this testimony. As already noted above, plaintiffs have simply pieced together a series of "facts," not necessarily relevant or even related to one another, in an attempt to show that Telxon, Meyo and Wipff *must have* known or *should have* known that FY92 was not going to be as successful as originally anticipated. Plaintiffs' scenario is insufficient to establish their claim.

Furthermore, plaintiffs are unable to establish that they *reasonably* relied on the public statements, especially in view of the cautionary language that is found in so many of the statements. For the securities fraud claim, pled under a "fraud on the market" theory, plaintiffs need not establish actual reliance because it is presumed. However, plaintiffs have directed this Court to no case law stating that, for their state law claim of negligent misrepresentation, there is a similar presumption of reliance. Even if reliance were presumed, plaintiffs would have to show that it was *reasonable*. This, is view of the discussion above, plaintiffs cannot do.

Accordingly, defendants are also entitled to summary judgment on Count II of plaintiffs' Amended and Consolidated Class Action Complaint and to that extent, all three motions are granted.

### IV. CONCLUSION

For the reasons discussed above, defendants' motions for summary judgment (Docket Nos. 158, 163, 165) are granted. Judgment shall be entered in favor of the de-

fendants on both counts of the Amended and Consolidated Class Action Complaint.

IT IS SO ORDERED.