64 F.3d 663
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re ROYAL APPLIANCE SECURITIES LITIGATION.
Harry B. CHARAL, et al., Plaintiffs-Appellants,
v.
ROYAL APPLIANCE MFG. CO., John A. Balch, Richard R. Goebel,
and Michael Merriman, Defendants-Appellees.
 No. 94-3284.
 United States Court of Appeals, Sixth Circuit.
 Aug. 15, 1995.
 
 Before: SILER and DAUGHTREY, Circuit Judges; ZATKOFF, District Judge.*
 PER CURIAM.
 
 
 1
 Shareholders of Royal Appliance, Inc. filed a consolidated class action suit against Royal Appliance, Inc. ("Royal") and its officers alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as common law principles of negligent misrepresentation. The district court granted defendants' motion to dismiss the complaint with prejudice. Based on the following discussion, we affirm.
 
 I.
 A. Factual Background
 
 2
 The primary business of Royal Appliance, Inc. is the manufacture and marketing of vacuum cleaners under the brand names of Dirt Devil and Royal. In 1981, an investor group led by defendant John A. Balch acquired control of Royal.
 
 
 3
 In 1984, Royal introduced the first in a line of corded, hand-held vacuum cleaners which became the largest selling line of its kind in the United States. By 1990, Royal had 43% of the hand-vac market. Sales quadrupled from $27.9 million in 1987 to $120 million in 1990, while its advertising and promotion expenses went from $4 million to $21.4 million.
 
 
 4
 In the third quarter of 1990, Royal entered the more competitive upright vacuum cleaner market. Royal's new product, the Dirt Devil Upright Deluxe, had a lower profit margin of 40% to 42% compared to the hand-vac's profit margin of 50%.
 
 
 5
 On August 7, 1991, the company commenced an initial public offering of common stock at $15.50 per share (pre-split). The stock rose to $19 per share on the first day of trading, and was considered one of the "hottest initial public offerings" of 1991. On February 18, 1992, the company announced that Royal's 1991 sales had increased 128%, and that 1991 pre-tax income had increased 288% over 1990's figures. The market immediately responded with Royal's stock rising to an all-time high of $62 per share on that day, and settling at $58 per share by the close of trading.
 
 
 6
 Early in the second quarter of 1992, Royal introduced an additional model, the Dirt Devil Upright Plus, which had a gross margin of 32% to 33%. Throughout the first six months of 1992, Balch, Royal's president and chief executive officer, made positive predictions about Royal's 1992 earnings. According to plaintiffs, defendants failed during this time to inform the public of its (1) substantial increase in advertising expenses, (2) lower gross margins on new product models, (3) unabsorbed overhead from new assembly plants, and (4) depressed revenues and earnings from April and May of 1992.
 
 
 7
 Following the close of trading on July 23, 1992, Royal announced its second quarter income at $902,000, or $.04 per share, a decrease of 78% from the 1991 second quarter net income. Consequently, Royal's stock dropped approximately $309 million (from $21.125 to $8.75 per share) in one day of trading. The company issued a press release pointing out the negative impact of increased advertising expenses, lower gross margins, and unabsorbed overhead, and conceding that "[t]he uncertainty of both the product sales mix and the timing of achieving anticipated sales volumes and operating efficiencies preclude any prediction on the level of earnings for the year."
 
 B. Procedural History
 
 8
 Within a week of the second quarter report, twelve shareholder class action suits were filed in the United States District Court for the Northern District of Ohio. On October 22, 1992, the shareholders filed their consolidated amended class action complaint against Royal and its officers--Balch, Richard R. Goebel, and Michael Merriman.
 
 
 9
 The class consists of shareholders who purchased Royal common stock from February 19, 1992 until July 23, 1992, at prices that allegedly were inflated because of material misrepresentations and omissions regarding the company's 1992 economic projections. Plaintiffs contend that these alleged misrepresentations violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as common law principles of negligent misrepresentation.
 
 
 10
 On February 9, 1994, the district court granted defendants' motion to dismiss the complaint with prejudice, holding that (1) the general projections of future success were immaterial, and (2) the specific projections of future success were not actionable under the "Bespeaks Caution" doctrine.
 
 II.
 
 11
 We give de novo review to a district court's decision to dismiss a suit pursuant to Fed.R.Civ.P. 12(b)(6). Mayer v. Mylod, 988 F.2d 635, 637 (6th Cir. 1993). The court must construe the complaint in a light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitled him to relief. Id. at 638. A court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations. Lawler v. Marshall, 898 F.2d 1196, 1199 (6th Cir. 1990). Finally, we may consider the full text of the SEC filings, prospectus, analysts' reports and statements "integral to the complaint," even if not attached, without converting the motion into one for summary judgment under Rule 56. See I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991).
 
 
 12
 In order to state a claim for securities fraud in violation of section 10(b) and Rule 10b-5, plaintiff must allege the following elements with particularity: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury. See Malone v. Microdyne Corp., 26 F.3d 471, 475 (4th Cir. 1994); Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir. 1991); 15 U.S.C. Sec. 78j(b); 17 C.F.R. Sec. 240.10b-5. See also Fed.R.Civ.P. 9(b) (requiring particularity in pleadings alleging fraud). Under a "fraud on the market" theory, reliance will be presumed based on a sufficient allegation that the misrepresentation is material. Basic, Inc. v. Levinson, 485 U.S. 224, 227 (1988). A misrepresentation is material if it significantly alters the total mix of information available. Id. at 231-32. Misrepresentations are not material if the investors are privy to the truth. Id.
 
 
 13
 Plaintiffs allege "fraud on the market" in that the defendants made optimistic 1992 sales and growth predictions while omitting the following allegedly material, misleading facts, which they knew or recklessly disregarded:
 
 
 14
 (1) advertising and promotional expenses were expected to and did substantially increase;
 
 
 15
 (2) high levels of overhead were unabsorbed based on the inefficient operating of two new plants;
 
 
 16
 (3) new product lines had lower gross margins; and
 
 
 17
 (4) April and May earnings figures were off-target, and, thus, annual projections would be off-target.
 
 III.
 
 18
 First, we uphold the district court's finding that defendant's vague, optimistic statements were not material. Allegations that a company engaged in general puffery is insufficient to claim securities fraud. Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993). "'Soft,' 'puffing' statements ... generally lack materiality because the market price of the share is not inflated by vague statements predicting growth. The whole discussion of growth is plainly by way of loose prediction .... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." Id. at 289-90 (citations omitted). The bulk of defendants' alleged misrepresentations, such as "Royal [is] on track to have a terrific year," were properly dismissed as puffery.
 
 IV.
 
 19
 Next, we must analyze the remaining misrepresentations which were dismissed under the "Bespeaks Caution" doctrine.[1] This doctrine was discussed and applied by this court in Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1040 (6th Cir. 1991), and clarified in Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993). Under the "Bespeaks Caution" doctrine, an optimistic, concrete prediction is immaterial if it is sufficiently accompanied by cautionary language. Mayer, 988 F.2d at 639; Sinay, 948 F.2d at 1040. "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge." In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371-72 (3d Cir. 1993), cert. denied, 114 S. Ct. 1219 (1994). As the Supreme Court explained, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1097 (1991). Application of this doctrine requires the court to assess the communications at issue on a case-by-case basis. In re Trump, 7 F.3d at 371.
 
 
 20
 Plaintiffs argue that the district court erred in finding that the following alleged misrepresentations were immaterial based on the cautionary language:
 
 
 21
 (1) On March 4, 1992, at a meeting with securities analysts in Cleveland, Balch stated that:
 
 
 22
 (a) Royal expected 1992 to be "another year of rapid growth, with both sales and earnings rising 25%-30%";
 
 
 23
 (b) he was "comfortable with analyst earning estimates in the range of $2.80 a share for 1992 which was $.63 more a share than the $2.17 the company had reported for 1991"; and
 
 
 24
 (c) Royal's 1992 sales would reach $350 million (or $77 million more than the $273 million reported for 1991).
 
 
 25
 Balch also noted that he "expect[ed] future growth to come from product line expansion, heavy advertising spending and further market expansion."
 
 
 26
 (2) At a June 9, 1992, presentation to investors, Balch reiterated that "We're comfortable with [analyst's estimates of Royal's 1992 net income of $2.80 per share]." He "cautioned that the company's profits might not rise in proportion to its sales .... He said the cost of product introduction and advertising, particularly in the fourth quarter, could cut into profit margins."
 
 
 27
 (3) On June 24, 1992, Balch, in a public broadcast television interview, was asked whether Royal's revenues and profits could realistically grow at an annual rate of 25% to 30%. He replied, "Yeah. That's probably alright." Balch added: "That depends a lot again on how Christmas goes each year. You know the fourth quarter is really a big one for us. And that little Hand-Vac and everything else for that matter, it's really hard to tell. A lot depends on retailers, how many of those guys left out there that haven't filed Chapter 11. You know, we went through that period where we had a lot of really unhealthy folks."
 
 
 28
 The district court properly dismissed the complaint based on Balch's use of cautionary language. Although plaintiffs might prefer more direct language, Balch's statements were more than "boilerplate" warnings. Saltzberg v. TM Sterling/Austin Associates, Ltd., 45 F.3d 399, 400 (11th Cir. 1995). Plaintiffs' allegations of misrepresentation focus on advertising expenses, new product start-up costs, and lower gross profit margins. A review of Balch's statements shows that any reasonable investor was put on notice regarding each of these issues. Moreover, in March 1992, Royal's 1991 Form 10-K stated that (1) gross margins as a percent of net sales had decreased in 1991, due in part to the increased percentage of the Company's sales mix of the Upright Deluxe, and (2) "[Royal] intends to increase significantly expenditures for advertising and promotion." We cannot conclude that Balch's future predictions coupled with express contingencies would have led a reasonable investor to believe that the mix of information had been significantly altered. See, e.g., In re Trump, 7 F.3d at 371-73.
 
 
 29
 In light of this finding, we further conclude that any specific omissions, including April and May's purportedly low numbers, would also be immaterial. Saltzberg, 45 F.3d at 400 (cautionary statements rendered alleged omissions or misrepresentations immaterial); In re Trump, 7 F.3d at 370-77 (specific disclosures of assumptions and industry risks rendered optimistic projections and failure to disclose certain information immaterial as a matter of law); Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243, 245 (8th Cir. 1991) (feasibility study contained no actionable omission or misstatement because of specific cautionary language and risk statements). But see Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir. 1994) ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."). Moreover, Royal's duty regarding the alleged omissions was further minimized because its projections were yearly, and revenues were actually up in April and May of 1992. In sum, the district court properly dismissed the complaint.
 
 V.
 
 30
 Plaintiffs also claim that the trial court abused its discretion by dismissing their consolidated complaint with prejudice. "Although federal courts are inclined to grant leave to amend following a dismissal order, there are circumstances where amendment will not be allowed." Sinay, 948 F.2d at 1041. One such obvious circumstance is where the amended complaint could not withstand a Rule 12(b)(6) motion. Id.
 
 
 31
 The district court found that plaintiffs' proposed amended complaint was not substantively different, and, hence, could not withstand a motion to dismiss. A review of that complaint indicates that the district court did not abuse its discretion in dismissing with prejudice.
 
 
 32
 AFFIRMED.
 
 
 
 *
 The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The court could have arguably dismissed the remaining misrepresentations as puffery, based on Raab. For example, some of the dismissed claims in Raab were based on an asserted "failure to disclose the adverse impact of [a] contracting slowdown on first quarter 1992 earnings," and on predictions that "results during the remainder of 1992 should be in line with analysts' current projections," and that "an expected annual growth rate of 10% to 30% over the next several years" with resulting "growth and success" would continue "well into the future." 4 F.3d at 288-91. Accord Malone v. Microdyne Corp., 26 F.3d 471, 479-80 (4th Cir. 1994) (prediction not actionable where company president stated that he was "comfortable with" analyst's earnings estimate of 80 cents per share in 1992 fiscal year, and $1.05 per share in 1993 fiscal year)