## In re COMPUWARE SECURITIES LITIGATION

No. 02–73793.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 3, 2004.

Steven J. Toll, Washington, D.C., E. Powell Miller, Troy, MI, for plaintiff.

Stephen Wasinger, Wasinger, Kickham and Hanley, Royal Oak, MI, for defendant.

### MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS, IN PART, AND GRANTING MOTION TO DISMISS WITHOUT PREJUDICE, IN PART

ANNA DIGGS TAYLOR, District Judge.

## I.

### Introduction

Before the court is Defendants' Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' consolidated complaint in this securities fraud action, which is a consolidation of two lawsuits previously filed in this court.[1] This memorandum constitutes the court's findings of fact and conclusions of law. For the reasons stated herein, Defendants' motion must be and is DENIED, in part, and GRANTED WITHOUT PREJUDICE, in part.

## II.

### Statement of Facts

Plaintiffs are an as yet uncertified class of public investors who purchased Defendant Compuware Corporation's common

---

1. This court entered an order consolidating *Dinallo v. Compuware Corp., Joseph A. Nathan, Henry A. Jallos and Laura L. Fournier* (02–73793); and, *Rosen v. Compuware Corp., Joseph A. Nathan, Henry A. Jallos and Laura L. Fournier* (02–74073), on March 6, 2003.

The consolidated complaint against Compuware also named Joseph A. Nathan, but substituted Peter Karmanos, Jr., and Elizabeth A. Chappell for Henry Jallos and Laura Fournier, as individual Defendants.

stock during the period from June 26, 1999 to April 3, 2002. Compuware provides computer software and consulting services, primarily for use with mainframe and client/server systems, including International Business Machine Corporation's ("IBM") OS/390 operating system. Indeed, during the class period each of Compuware's 10–K SEC filings described its relationship with IBM as follows:

> [A] majority of our revenue from software products is dependent on our customers' continued use and acceptance of IBM and IBM-compatible mainframe products and on the acceptance of our pricing structure for software licenses and maintenance. Compl. ¶ 4.

Compuware's File–AID and Abend–AID software products accounted for one-third of Compuware's total sales, and managed mainly databases run on IBM mainframe computers. Compl ¶ 9. The instant litigation arises from IBM's development of software that directly competed with Compuware's leading products, after complaints that Compuware's high prices were elevating the cost of mainframes, and also arises from Compuware's disclosures regarding the nature and extent of the threat that IBM posed, during the class period.

Specifically, Plaintiffs contend that Defendants issued a series of false and misleading statements designed to conceal from the investing public the serious problems which developed in Compuware and IBM's business relationship. Because factual allegations of the Complaint must be accepted as true in a Rule 12(b)(6) motion to dismiss a securities fraud claim, Plaintiffs allegations, adopted by the court for purposes of this motion, are outlined below. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir.2001)(*en banc* ).

## A. Compuware's Relationship With IBM

IBM and Compuware maintained a mutually beneficial relationship for many years prior to 1997. It consisted of Compuware's development of operating systems and computer application software designed to run on IBM mainframe computers. Compl. ¶ 4. In order to sustain this relationship, IBM openly shared information about its operating systems and critical software, and allowed Compuware access to IBM source code information. *Id.*

By late 1997 or early 1998, although undisclosed to Compuware's investors, its relationship with IBM began to deteriorate. The price of Compuware software was elevating the cost of IBM mainframes unnecessarily, IBM felt. IBM's Senior Vice President of the Executive Software Group, Steve Mills, was so concerned about customer dissatisfaction with Compuware's pricing that he met with Defendant Peter Karmanos, Jr. ("Karmanos"), Compuware's Chairman and CEO on the subject. Compl. ¶ 10. Former Compuware employees, including the Director of Product Management and the Enterprise Software Manager, allegedly will confirm that in 1997 or 1998, there were meetings in which IBM advised Compuware's management that IBM planned to introduce pricing changes through its own new software, and that Compuware managers also discussed among themselves IBM's increasingly aggressive pursuit of alternatives to Compuware's software. Compl. ¶¶ 11–12.

## B. IBM's Competition with Compuware

On August 1, 2000, IBM announced the release of its new products, File Manager and Fault Analyzer. IBM specifically offered a one-time discounted upgrade "for

customers currently using competitive error capture, reporting and analysis tools such as Compuware Abend–AID and File–AID ...." Compl. ¶ 13; Defs. Ex. 6, p. 8. Compuware's two leading products, File–AID and Abend–AID, data and fault management software programs, respectively, accounted for approximately 23%–36% of the company's total revenue from 1999–2001. Compl. ¶¶ 6–9. Additionally, Plaintiffs allege that IBM employee Tom Ross informed a Compuware employee, Bruce Klenck, via electronic mail on August 25, 2000, that IBM would not share a testing version of a particular IBM software product due to the increasingly competitive relationship between the two companies. Compl. ¶ 14.[2] Compuware's management had knowledge of IBM's adversarial stance at the time, because that e-mail was forwarded forthwith to both Compuware's Director of Product Management, Jim Holland, and the Vice President of Enterprise Development, Chris Galloway. Compl. ¶ 15.

## C. Compuware Statements Concerning IBM's Competition

Plaintiffs maintain that in its many SEC filings and press releases throughout the Class Period, Compuware failed to identify IBM as a competitor and did not reveal that IBM had developed products to directly compete, at a discount, with Compuware's staple products, its File–AID and Abend–AID software. For example, in its June 26, 1999 10–K report filed with the SEC, Compuware listed its competitors, and then stated that:

> Although we believe our mainframe products are generally complementary to those marketed by IBM, IBM does

offer some products that are directly competitive and there can be no assurance that IBM will not choose to offer significant competing products in the future.... Our ability to remain competitive will depend, to a great extent, upon our performance in product development and customer support.

In a July 21, 1999 press release, Karmanos stated that "I see no significant trends or impediments that would negatively affect our prospects." Karmanos also stated that "our business remains solid," in a press release dated October 18, 1999.

On January 25, 2000, Defendant Elizabeth Chappell, Compuware's Executive Vice President of Corporate Communications and Investor Relations, stated in a press release that "we continue to see strength in our traditional lines of business." Defendant Chappell went on to state, in a May 1, 2000 press release, that "Despite a tough fourth quarter ... [w]e will maintain our competitive edge ... as we strive to significantly increase sales of our distributed software products." The June 26, 2000 10–K report quoted the same language referenced above from the 1999 10–K report and again listed Compuware's competitors; that list again did not include IBM.

The 2001 10–K, filed on June 26, 2001, included the same information, verbatim, as the above-quoted 1999 and 2000 filings. On January 23, 2001, a Compuware press release quoted Karmanos as stating his pleasure that progress had been made toward "positioning Compuware for consistent long-term growth and improved profitability ... Our business is on a solid

---

**2.** The e-mail stated that:

I have bad news, due to our increasingly competitive relationship with Compuware we cannot give you a BETA version. FYI: We just shipped 'Fault Analyzer for OS/390' and File manager for OS/390', direct competitors

with AbendAid and FileAid. We are working feverishly to make Debug Tool [an IBM software product] better than Xpediter. Therefore, shipping a BETA to you would be seen as helping the enemy.

foundation ...." A July 19, 2001 press release quoted Defendant Joseph Nathan, Compuware's President, as saying that "We continue to have exceptional leverage to increase future profitability as market conditions improve."

Plaintiffs contend that these statements were false and misleading because Compuware wrongly communicated that IBM's development of competing products was a mere risk while knowing that IBM was, in actual fact, developing competing software and overtaking Compuware's software market share by selling it more cheaply. Compuware also failed to communicate that its development of mainframe software was in jeopardy because IBM now refused to share its source codes, a factor substantially impacting Compuware's competitive capacity.

### D. Compuware's Lawsuit Against IBM

On March 12, 2002, Compuware filed a lawsuit against IBM alleging copyright infringement, antitrust violations and unfair trade practices.[3] In that case (the "IBM litigation"), Compuware alleged that "[u]ntil 1999, IBM did not substantially compete with Compuware ..." and that "[c]ommencing in at least 1999, IBM developed and carried out a scheme specifically intended to compete unfairly." Compl. ¶ 17. Compuware also alleged that:

a) "Pursuant to this scheme, IBM undertook to develop a set of mainframe tools to compete with Compuware;"

b) "[I]n early 2000, ... IBM ... elected simply to copy ... portions of Compuware's source code or its File–AID IMS product;"

c) IBM markets File Manager and Fault Analyzer "in competition with and

as the functional equivalent" of Compuware's File–AID and ABEND–AID;

d) "IBM has changed its long-held practices, and has begun to (i) refuse to provide Compuware and other sellers of mainframe software tools access to such IBM information, and (ii) refuse to cooperate generally with Compuware and other sellers of mainframe software tools;"

e) "IBM's actions ... have caused Compuware significant expense. They have also interfered with Compuware offering ... certain desirable and innovative functions and features with its products."

The complaint in the IBM litigation also acknowledged that Compuware had received the above-referenced August 2000 e-mail from IBM employee, Bruce Klenck. IBM Litigation Compl. ¶ 58.

Compuware's press release of March 12, 2002 stated that IBM had "attempted to enter the mainframe software tools market ... misappropriating Compuware's source code...." Also concerning the IBM litigation, the corporate press release stated that:

> We have been considering this distressing issue for quite some time and regrettably concluded that Compuware was required to take this action in order to protect the interests of the Company, its customers and its shareholders ... IBM has misappropriated and illegally used portions of Compuware's copyrighted software products for IBM's new File Manager and Fault Analyzer products. Compl. ¶ 19.

On April 3, 2002, Compuware issued a press release stating that it would take a goodwill impairment charge of $323 million

---

**3.** *Compuware Corp. v. Int'l Bus, Mach. Corp.,* 02–70906, was assigned to United States District Judge George Caram Steeh and is still pending. Citations to this case are denoted: "IBM Litigation Compl."

and restructuring charges of $45–$55 million for cutting jobs and closing offices. Compuware shares fell from $11.10 per share on April 3, 2003, to $8.28 per share on April 4, 2003.

Compuware's SEC filings did not acknowledge IBM as a competitor until submission of its June 25, 2002 10–K form which stated

The markets for our software products are highly competitive and characterized by continual change and improvement in technology. Although no company competes with us across our entire product line, we consider over 40 firms to be directly competitive with one or more of our products. *Our competitors include* BMC Software, Inc., Computer Associates International, Inc., *International Business Machines Corporation (IBM),* Mercury Interactive Corporation, Oracle Corporation and Rational Software Corporation. Compl. ¶ 53 (emphasis added).

An August 19, 2002 Crainsdetroit.com article quoted a Moody's Investors Service analyst as saying that the soured Compuware–IBM relationship meant "big trouble for [Compuware] because 80 percent of its software revenue and 36 percent of its total revenue comes from the IBM mainframe market." Compl. ¶ 62.

Plaintiffs maintain that Compuware artificially inflated its stock prices during the class period by failing to disclose the entire truth of its deteriorating relationship with IBM and that the relevant market, when aware of at least the most recent events, reacted strongly. This was reflected in the 25% decline in stock value in one day. Further, Plaintiffs allege that Defendants Karmanos, Chappell and Nathan, the individual Defendants, stood to gain a substantial personal benefit from inflated stock prices as each owned significant, from approximately 28 thousand to 23 million, shares of common stock, as well as millions of stock options valued from $5 million to $85 million throughout the class period. Additionally, the individual Defendants prepared the company's press releases and SEC filings. Compl. ¶ 93. The individual Defendants had control over other Compuware employees and the corporation had control over its officers, executives and all employees. *Id.*

## III.

### *Standard of Review*

■ Plaintiffs allege that Defendants violated §§ 10(b) and 20(a) of the Exchange Act and Rule 10b–5 which proscribe "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." 15 U.S.C. § 78j(b), 78t(a); 17 C.F.R. § 240.10b–5. Securities fraud allegations, like all fraud allegations, must be stated with particularity in compliance with Rule 9(b) of the Federal Rules of Civil Procedure. Fed. R.Civ.P. 9(b). To meet the substantive standard for a claim under § 10(b) and Rule 10b–5, Plaintiffs must allege, in connection with the purchase or sale of securities, 1) the misstatement or omission of a material fact; 2) made with scienter; 3) upon which Plaintiffs justifiably relied; and 4) which proximately caused Plaintiffs' injuries. *Hoffman v. Comshare, Inc. (In re Comshare, Inc. Sec. Litig.),* 183 F.3d 542, 548 (6th Cir.1999).

■ The Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standard, designed to discourage frivolous litigation, further requires that the Complaint specify each alleged misleading statement and state with particularity facts giving rise to a strong inference that Defendants acted with scienter. 15 U.S.C. § 78u–4(b)(2), (b)(3)(A); *Miller v. Champion Enterp. (In re Champion Sec. Litig.),* 346 F.3d 660, 672 (6th Cir.

2003); *Helwig*, 251 F.3d at 548. Inferences of scienter must be both reasonable and strong in order to survive a motion to dismiss. *Comshare*, 183 F.3d at 550. Strong inferences need not be irrefutable, however Plaintiffs are entitled only to the most plausible of competing inferences. *Champion*, 346 F.3d at 673 (quoting *Helwig*, 251 F.3d at 553). Other factors relevant to determining scienter include a) insider trading at a suspicious time or in an unusual amount; b) disregard of the most current factual information before making statements; and c) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552.

Although the appropriateness of dismissing securities fraud claims generally turns on adequate scienter allegations, the court will also address the disputed issues of materiality, causation and the applicable statute of limitations. Dismissal is improper "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Comshare*, 183 F.3d at 547 (internal citations omitted).

## IV.

*Analysis*

### A. Materiality

■ Defendants contend that Plaintiffs cannot establish material omission without first establishing that Defendants had an affirmative duty to disclose the allegedly omitted information. Specifically, Defendants contend that: 1) there was no obligation to disclose a competitors' products or plans; 2) Compuware's identification of IBM as a potential competitor in its annual 10–K SEC filings satisfied any disclosure obligations that Compuware may have had; and, 3) Compuware's relationship with IBM was publicly known. In response, Plaintiffs argue that the omitted facts were material because 1) Defendants misled in-

vestors about a deteriorating business relationship which accounted for one-third of Compuware's total sales; 2) Compuware stock dropped 25% in one day upon full disclosure and market analysts reacted strongly by writing that Compuware was in "big trouble;" and 3) even if Defendants had no affirmative duty to disclose, once they chose to speak, their statements should have been complete and accurate.

### 1. Duty to Disclose

■ Materiality depends upon the significance the reasonable investor would place on the withheld or misrepresented information. *Helwig*, 251 F.3d at 555 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). If the misrepresented fact is otherwise insignificant, then it is inadequate to claim that a statement is false or incomplete. *Basic, supra*, 485 U.S. at 238, 108 S.Ct. 978, 99 L.Ed.2d 194. Compuware's plummeting stock price in one day, however, as well as the independent analyst's comment that Compuware was in "big trouble," if it lost IBM as a partner, are indicative of the omitted information's significance to investors. It is logical that a reasonable investor would be concerned about the loss of a partner that accounted for almost one-third of Compuware's total business.

As explained *infra*, Plaintiffs have presented allegations giving rise to the strong inference that Defendants well knew of the increasingly serious threat that IBM posed, and that Compuware's worsening relationship with IBM would adversely affect Compuware's business. Nevertheless, Compuware and its named executives continued to make favorable statements as to the company's solid position and lack of impediments to progress. The court finds that "there is a 'substantial likelihood' that the disclosure of the omitted fact[s] would have been viewed by the reasonable inves-

tor as having significantly altered the 'total mix' of information made available." *Helwig,* 251 F.3d at 556 (quoting *Basic, supra,* 485 U.S. at 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194). Thus, Plaintiffs have adequately pleaded that this information was material, and Defendants had a duty to disclose it.

### 2. Obligation to Fully Disclose

■ Plaintiffs have alleged that Compuware was aware that IBM had released, at a discount, products which directly competed with Compuware's leading software, and, via the August 2000 e-mail from IBM's employee, Bruce Klenck, Compuware was also aware that IBM was unwilling to share the source code information on which Compuware's products, profitability, and enduring competitive viability were based. Indeed, by that e-mail Compuware was denominated the enemy of IBM. Defendants claim that Compuware and its executives had no obligation to disclose a competitor's market advantage or to disparage their own product.

■ However, "[e]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assumes a duty to speak fully and truthfully on those subjects.'" *Helwig,* 251 F.3d at 560 (citations omitted). "With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known-but it may not choose half-truths." *Id.* IBM's introduction of the Fault Analyzer and File Manager programs not only signaled the release of directly competing products, but were accompanied by a staunch refusal to share indispensable source code information. Clearly, a good relationship had ended. In light of this, Defendants' choice to disclose anything about that relationship in its press releases and SEC filings mandated full disclosure

concerning the benefits, as well as the impediments, to realizing the full potential of that relationship. *Id.* at 561 ("[A] corporation that chooses to divulge uncertain estimates 'must also inform the shareholders as to the basis for and limitations on the projected realizable values'").

### 3. Public Knowledge of Compuware and IBM's Relationship

Defendants maintain that IBM's competitive threat was a well-publicized fact to the investing public and, in support, have attached to their briefs articles from Infoworld.com, Information Week.com, the META Group, Database Trends, CNET News, and Giga Information Group, all computer industry publications. *See,* Defs. Ex. 5, 7–14. Plaintiffs urge that these articles are inappropriate for consideration on this motion because it cannot be suggested that they would be seen in the relevant securities investors' and analysts' market. Plaintiffs also argue that the META Group, Database Trends and Giga Information Group articles are only available through subscription services and that the other articles, though they discuss IBM's new product and possible competitive advantage, never mention Compuware at any rate.

■ Generally, however, courts should not consider matters outside the pleadings on a motion to dismiss. *Weiner v. Klais & Co.,* 108 F.3d 86, 88–89 (6th Cir.1997). In securities fraud cases, however, courts may consider the full text of SEC filings, prospectuses, analysts' reports and statements integral to the complaint, even if not attached. *In re Credit Acceptance Corp. Sec. Litig.,* 50 F.Supp.2d 662, 669 (E.D.Mich.1999)(citing *In re Royal Appliance Sec. Litig.,* 64 F.3d 663, 1995 WL 490131 (6th Cir.1995)(unpublished)). Courts may also take judicial notice of newspaper articles and other public infor-

mation when considering a motion to dismiss. *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 (9th Cir. 1999). The court finds that the articles attached as Defendants Exhibits 5, 7–14 were not public information, and therefore cannot be judicially noticed. The articles also do not fall under the categories of SEC filings, prospectuses or analysts reports and are not integral to the complaint. The court, thus, declines to consider them on this motion to dismiss.

## B. Scienter

■■■ As a threshold matter, to establish Defendants' liability under § 10(b), Plaintiffs must allege sufficient scienter. *Comshare*, 183 F.3d at 548. This court must inquire whether the facts, as presented, produce a strong inference of either recklessness, for statements of pres-

ent or historical fact, or actual knowledge for forward-looking statements that are material and unaccompanied by meaningful cautionary language.[4] 15 U.S.C. § 78u–5(c)(1); *Helwig*, 251 F.3d at 552. If material and accompanied by meaningful cautionary language, forward-looking statements are protected by the PSLRA's safe harbor provision which renders the state of mind irrelevant. 15 U.S.C. § 78u–5(a),(c)[5]; *Champion*, 346 F.3d at 672. Forward-looking statements that are not accompanied by meaningful cautionary language must have been made with actual knowledge of their false or misleading nature. *Id.* For statements that are not forward-looking, the court must determine whether Plaintiffs have otherwise stated a claim under the PSLRA by pleading that Defendants have acted with the requisite scienter, recklessness, which is defined as

4. A "forward-looking statement" under the PSLRA, in relevant part, is:
(A) a statement containing a projection of revenues, income …, earnings … per share, capital expenditures, dividends, capital structure or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives related to products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C) …. 15 U.S.C. § 78u–5(i)(1).

5. 15 U.S.C. § 78u–5(a), (c) state, in relevant part, that:
(a) Applicability. This section shall apply only to a forward-looking statement made by-
(1) an issuer that, at the time that the statement is made, is subject to the reporting requirements of… [15 U.S.C. § 78m(a) or 78o(d) ];
(2) a person acting on behalf of such issuer ….
(c) Safe harbor.

(1) In general….[I]n any private action arising under this title … that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that-
(A) the forward-looking statement is-
(i) identified as a forward looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial; or
(B) the plaintiff fails to prove that the forward-looking statement-
(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
(ii) if made by a business entity;[,] was-
(I) made by or with the approval of an executive officer of that entity; and
(II)made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

highly unreasonable conduct which is an extreme departure from the standards of ordinary care. *Id.; Helwig,* 251 F.3d at 554. As explained below, Plaintiffs have met both the substantive and the pleading standards of a securities fraud claim by raising a reasonable and strong inference that Defendants acted with the requisite scienter. Therefore Defendants' motion must be denied. Each of Defendants' allegedly false statements are examined in turn.

1. 1999, 2000, and 2001 10–K Reports

Plaintiffs allegations center on Defendants statements in the 10–Ks that "our mainframe products are generally complementary to those marketed by IBM." Defendants maintain that the statements made in its 10–K filings are forward-looking and are protected by the PSLRA. Conversely, Plaintiffs argue that the statements are of present or existing facts and thus, are not forward-looking. Alternatively, Plaintiffs also argue that even if the statements are forward-looking, they are still actionable because Defendants knew information which contradicted the challenged statements. The 1999, 2000, and 2001 10–K reports contained the same language, with one exception. In 2001, Compuware added a sentence that read: "Although no company competes with us across our entire product line, we consider over 40 firms to be directly competitive with one or more of our products." Defs. Ex. 16, Compuware's 2001 10–K, p. 9. The language common to the 1999, 2000, and 2001 10–K filings states:

The markets for our software products are highly competitive and characterized by continual change and improvement in technology. Our competitors include BMC Software, Inc., Computer Associates International, Inc., Forte Software Incl, Informix Corporation, Mercury Interactive Corporation, Oracle Corporation, Rational Software Corporation, Sybase, Inc. and VIASOFT, Inc. None of the competitors competes in all of our product lines. Although we believe our mainframe products are generally complementary to those marketed by IBM, IBM does offer some products that are directly competitive and there can be no assurance that IBM will not choose to offer significant competing products in the future. The principal competitive factors affecting the market for our software products include: responsiveness to customer needs, functionality, performance, reliability, ease of use, quality of customer support, vendor reputation and price. We believe, based on our current market position, that we have competed effectively in the software products marketplace. Nevertheless, a variety of external and internal events and circumstances could adversely affect our competitive capacity. Our ability to remain competitive will depend, to a great extent, upon our performance in product development and customer support. To be successful in the future, we must respond promptly and effectively to the challenges of technological change and our competitors' innovations by continually enhancing our own product lines. Compl. ¶ 36.

a. The 1999, 2000, and 2001 10–K Filings are Forward–Looking.

Mixed statements of present fact and future prediction must be treated as forward-looking. *Champion,* 346 F.3d at 667 (citing *Harris v. Ivax Corp.,* 182 F.3d 799, 805–07 (11th Cir.1999)). Paragraph 36 of the Complaint quotes both statements of historical fact as well as forward-looking statements. At the least, this statement refers to objectives relating to Compuware's products and services and the assumptions underlying Compuware products' future performance. 15 U.S.C. § 78u–5(i)(1)(C),(E). The 1999, 2000, and

2001 10–K filings, then, are forward-looking within the meaning of the PSLRA.

**b. The 1999, 2000, and 2001 10–K Filings do not Contain Meaningful Cautionary Language.**

■ In order to fall within the safe harbor provision, the 10–K filings must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the [filings]." 15 U.S.C. § 78u–5(c)(1)(A). Defendants' statement that "there can be no assurance that IBM will not choose to offer significant competing products in the future," implied that IBM's development of competing software was a possibility as opposed to an actuality, and therefore, this statement does not qualify as *meaningful* cautionary language. The court finds that the 10–K filings did not satisfy Defendants' obligation to warn investors of risks and negatives as significant as those which were actually realized.

**c. Defendants had Actual Knowledge that the 10–K Statements Were False.**

Defendants maintain that the Complaint offers no factual allegations to establish that Defendants had any reasonable basis for believing that the company would not continue to perform as well as it had in the past. Predictions and opinions contain three implicit factual assertions: 1) that the statement is genuinely believed, 2) that there is a reasonable basis for that belief, and 3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. *Helwig*, 251 F.3d at 557.

Defendants' SEC filings in 1999 and 2000 reiterated favorable estimates of Compuware's competitive capacity despite the alleged fact that Defendant Karmanos had met with IBM's Senior Vice President of the Executive Software Group to discuss IBM's extreme dissatisfaction with Com-puware's pricing and its effect upon IBM sales as early as late 1997 or early 1998 and that open internal discussions at Compuware, beginning in 1997, focused upon IBM's aggressive pursuit of ways to address Compuware's high prices, including developing its own line of software. Compl. ¶¶ 10–12. The 2001 10–K form included the same language that the forms for the prior two years had included, notwithstanding Compuware's receipt of the August 2000 email from IBM's Bruce Klenck adamantly refusing to provide information necessary for product development which the 10–K stated was vital to Compuware's ability to remain competitive. Compl. ¶ 14. Plaintiffs specifically alleged that the email was forwarded up the chain to Compuware's Vice President of Enterprise Development. Compl. ¶ 15.

Finally, when filing the IBM litigation, Compuware admitted that it had considered suing IBM for "some time" prior to actually filing its litigation, which alleged that IBM had engaged in copyright infringement and unfair trade practices since 1999. Compl. ¶ 17. Nevertheless, Compuware's SEC filings did not reflect the actual status of its relationship with IBM as a direct competitor, as opposed to a partner that happened to offer some directly competing products, until its 2002 10–K form was filed, three months after the start and announcement of the IBM litigation. In the aggregate, these facts offer a reasonable and strong inference that Defendants actually knew that IBM posed a significant competitive threat and that Defendants' statements in the SEC filings were made with the intent to deceive investors. *See, In re Prudential Sec. Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996)(noting that the safe harbor provision provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near cer-

tainty that the Grand Canyon lies one foot away").

### 2. July 21, 1999 Press Release

■ The July 21, 1999 press release quoted Defendant Karmanos as saying, in relevant part, that:

I am pleased to report an excellent quarter, beginning what we all believe will be another great year for Compuware ... The results we've achieved continue to support a 35–to–40 percent growth estimate for fiscal year 2000, and I see no significant trends or impediments that would negatively affect our prospects.

#### a. The July 21, 1999 Press Release is Forward–Looking.

The July 21, 1999 is clearly a statement containing projection of revenues, future economic performance, as well as the assumptions underlying those projections, and therefore qualifies as forward-looking under the PSLRA. 15 U.S.C. § 78u–5(i)(A),(C),(D).

#### b. The July 21, 1999 Press Release did not Contain Meaningful Cautionary Language.

There is no hint, whatsoever, in the portions of the July 21, 1999 press release that were presented in the Complaint, of risk factors or facts which might cause actual results to differ materially from these happy predictions. 15 U.S.C. § 78u–5(c)(1)(A)(i). The July 21, 1999 press release, then, fails to offer meaningful cautionary language which would allow investors to make a fully informed decision concerning Compuware securities. Absent meaningful cautionary statements, the July 21, 1999 press release does not fall within the first prong of the PSLRA's safe harbor. *Id.*

#### c. The July 21, 1999 Press Release was Made With Actual Knowledge of Falsity.

■ As discussed in Part IV.B.1.c. of this Opinion, *supra*, in late 1997 or early 1998, Defendant Karmanos had personally met with an IBM executive to discuss IBM's extreme dissatisfaction with Compuware's prices and the effect those prices had upon mainframe purchases. Despite this personal knowledge of a strained relationship, Karmanos failed to disclose the need to repair Compuware's relationship, which, if neglected, was a significant impediment that could negatively affect Compuware's future prospects. Plaintiffs have alleged and provided the most plausible inference that Defendant Karmanos knowingly stated that he saw "no significant trends or impediments" to Compuware's growth while being fully aware that a company accounting for one-third of the company's business was becoming increasingly dissatisfied with Compuware's price structure and that an all-important relationship may well disintegrate at any time, absent correction. Compl. ¶ 36.

### 3. October 18, 1999 Press Release

This press release also quoted Defendant Karmanos who stated that:

We are pleased that this quarter's results confirm that Compuware's business remains solid and not dependent on any single technology phenomena ... Our inherent growth rate of 35–40 percent has the potential to continue accelerating and yielding incremental growth with larger absolute numbers.

#### a. The October 18, 1999 Press Release is Forward–Looking.

This mixed statement of present fact and future prediction presents a difficult question of whether Defendants' statements are forward-looking or not. Never-

theless, the statute is unequivocal. Statements containing projections of revenues or of future economic performance, or any of the assumptions underlying either, are protected by the safe harbor provision. 15 U.S.C. § 78u–5(i)(1)(A),(C), (D). Therefore, the October 18, 1999 statement is forward-looking. *Id.*

b. No Meaningful Cautionary Language Accompanied the October 18, 1999 Press Release.

The October 18, 1999 press release clearly contains no language warning investors of any risk at all, including the competitive threat that IBM posed. Business did not remain solid, nor was it dependent upon any more than the IBM mainframe technology. But no warning was given, meaningfully, of these facts.

c. Plaintiff's Have Alleged Actual Knowledge.

■■■ Again, because in 1997 or 1998 IBM's Senior Vice President of the Executive Software Group, Steve Mills, directly informed Defendant Karmanos that Compuware needed to alter its pricing structure, Plaintiffs have adequately alleged that Defendant Karmanos had actual knowledge that his statements that "Compuware's business remain[ed] solid" and had "potential to continue accelerating" were false when made.

4. January 25, 2000 Press Release

The January 25, 2000 press release quoted Defendant Chappell as stating that:

Our revenues are as broad-based as the technologies our clients continue to utilize and support. In addition to growing e-commerce opportunities, we continue to see strength in our traditional lines of business.

a. The January 25, 2000 Press Release is Forward–Looking.

The January 25, 2000 press release barely passes muster for forward-looking statements. While extremely vague, the statement that "we continue to see strength in our traditional lines of business," appears to outline plans and objectives for future operations and its underlying assumptions. 15 U.S.C. § 78u–5(i)(1)(B),(D). Therefore, the January 25, 2000 press release is a forward-looking statement.

b. No Meaningful Cautionary Statements Accompany this Press Release.

In the limited portion of the press release quoted in the Complaint, the only version made available to the court, there are no cautionary statements at all, therefore, the January 25, 2000 press release does not meet the first requirement to fall under the safe harbor provision.

c. There is an Insufficient Averment of Actual Knowledge.

■■■ Plaintiffs allege that the January 25, 2000 press release is actionable for the reasons stated in Paragraphs 36 and 42 of the Complaint. Paragraph 42 reads: "because at the time these statements were made, Compuware was aware of the fact that IBM was developing significant mainframe software products to compete with Compuware's File–AID and Abend–AID software lines, the Defendants had no reasonable basis to believe that its traditional lines of business remained strong." *Compl.* § 42; *see also, Compl.* ¶ 36. Neither Paragraph 36 nor Paragraph 42, however, specifies Defendant Chappell's personal state of mind when she spoke or authorized the press release. The implication of the allegation is that Defendant Chappell made the statement knowing that it was false. Implied allegations do not meet the PSLRA's mandate to plead with particularity. 15 U.S.C. § 78u–4(b)(2).

Plaintiffs have also pleaded that as Compuware's Executive Vice President of Corporate Communications and Investor Relations, Defendant Chappell had direct control over and responsibility for publicly disseminated statements concerning the status of Compuware's securities. Defendant Chappell was the beneficial owner of anywhere from 28,524 shares to 169,399 shares of Compuware common stock and as many as 147,037 stock options. Compl. ¶ 67. By virtue of these vast stock holdings and options, Plaintiffs argue, Defendant Chappell essentially had motivation and opportunity to craft press releases to maintain the artificially high value of Compuware securities. Compl. ¶ 68.

 Facts indicating motive and opportunity to commit securities fraud may state a claim under the PSLRA if those facts create a strong inference that defendants acted with the requisite scienter, actual knowledge in this instance. However, conclusory allegations of motive and opportunity will not suffice to survive a motion to dismiss. *Helwig*, 251 F.3d at 551. Motive and opportunity alone do not state adequate scienter, but when combined with allegations that the highest levels of Compuware management were well-aware that IBM was dissatisfied with Compuware's prices and that this issue was openly discussed as early as late 1997, such allegations create a strong inference that Defendant Chappell had actual knowledge that statements contained in the January 25, 2000 were false. Compl. ¶ 36. Nevertheless, Plaintiffs have not pleaded facts directly attributing actual knowledge to Defendant Chappell with sufficient specificity. Therefore, although Plaintiffs have alleged a strong inference of the requisite scienter to survive a motion to dismiss, to the extent that averments of actual knowledge are not specific as to this individual Defendant, Plaintiffs' complaint is dismissed as to Defendant Chappell and, if there is no amendment within 20 days of this order, the dismissal is with prejudice.

5. May 1, 2000 Press Release

The May 1, 2000 press release quoted Defendant Chappell as stating:

Despite a tough fourth quarter, we delivered solid results for fiscal year 2000 ...Our software business remains healthy and will continue to grow. We will maintain our competitive edge in the OS/390 market as we strive to significantly increase sales of our distributed software products.

a. This is a Forward–Looking Statement.

Although the May 1, 2000 press release certainly contains a statement of past events in terms of the solid results previously delivered, Plaintiffs' allegations are based on the entire quoted statement which refers to assumptions underlying objectives for future performance. 15 U.S.C. § 78u–5(i)(1)(B),(D). Therefore, the May 1, 2000 press release is a forward-looking statement.

b. The May 1, 2000 Press Release is Entitled to Safe Harbor Protection.

The May 1, 2000 press release, like its above-discussed predecessors, contains absolutely no cautionary language upon which a reasonable investor might base a decision concerning the sale or purchase of Compuware securities. For the reasons discussed in Part IV.B.4.c. of this Opinion, *supra*, however, while Plaintiffs' allegations give rise to a strong inference, Plaintiffs have not alleged with sufficient particularity that Defendant Chappell, herself, spoke with actual knowledge that her statements were false. Therefore the allegations concerning the May 1, 2000 press release are dismissed without prejudice until after 20 days no amendment has been

filed. Then, as with the allegations against Defendant Chappell previously discussed, they are dismissed with prejudice.

### 6. January 23, 2001 Press Release

On January 23, 2001, Compuware issued a press release quoting Defendant Karmanos, who stated, in part, that:

> We are pleased with the progress we have made in positioning Compuware for consistent long-term growth and improved profitability ... Our business is on a solid foundation, we are executing our strategy and we are achieving our objectives. Our outlook for the future is very optimistic.

#### a. The January 23, 2001 Press Release is not Forward–Looking

■ This excerpt of the January 23, 2001 press release is a statement of historical and present existing facts. None of the statement, which Plaintiffs claim is actionable, falls within the statutory definition of a forward-looking statement.

#### b. Plaintiffs Sufficiently Alleges the Requisite Scienter

■ Statements that are not forward-looking are examined for allegations that Defendants acted, at the least, recklessly. *Champion,* 346 F.3d at 672. Plaintiffs allege that the statements in the January 23, 2001 press release were false and misleading when made because Defendants have stated in the IBM Litigation that IBM had by that time released its directly competitive, and discounted, products, and in the August 25, 2000 e-mail, IBM had directly informed Compuware that it considered itself to be Compuware's enemy. Plaintiffs have alleged facts which give rise to a strong inference that Defendant Karmanos' statement, in light of these facts as well as the facts that he had personally met with IBM executives about their problems and was aware of IBM's dissatisfaction, was, at the least, reckless in stating

to investors that the business was on a solid foundation. Compl. ¶ 36.

### 7. July 19, 2001 Press Release

A July 19, 2001 press release contained the following statement from Defendant Nathan, Compuware's President:

> We are pleased to have increased earnings and beaten consensus EPS estimates for the quarter and to have used our strong cash flow to reduce debt by $88 million ... Growth in earnings indicates that we continue to have exceptional leverage to increase future profitability as market conditions improve.

#### a. The July 19, 2001 Press Release is Forward–Looking.

While it contains statements of historical and present facts, the July 19, 2001 also contains future predictions concerning future economic performance and the assumptions underlying those predictions. 15 U.S.C. § 78u–5(i)(1)(C),(D). The July 19, 2001 qualifies as a forward-looking statement under the PSLRA.

#### b. The July 19, 2001 Press Release is Entitled to Safe Harbor Protection.

■ This press release contains no meaningful cautionary language, and thus fails to satisfy the first element of eligibility for safe harbor protection. Plaintiffs, however, do not offer any allegations of scienter and instead rest on the vague assertion that this press release was materially false and misleading for the reasons set forth in paragraph 51, which simply quotes the press release. Absent allegations of actual knowledge, the July 19, 2001 press release is entitled to safe harbor protection. Paragraphs 51 and 52 of the Complaint, as currently stated, are subject to dismissal. If there has been no amendment within 20 days, this dismissal of Defendant Nathan is with prejudice.

8. March 12, 2002 Press Release

The day that Compuware filed the IBM Litigation, Compuware issued a press release which stated that:

> We have been considering this distressing issue for quite some time and regrettably concluded that Compuware was required to take this action in order to protect the interests of the Company, its customers and its shareholders ... IBM has attempted to enter the mainframe software tools market and compete with Independent Software Vendors ("ISVs") by misappropriating Compuware's source code and even copying our user manual ... IBM has misappropriated and illegally used portions of Compuware's copyrighted software products for IBM's new File Manager and Fault Analyzer products.

a. The March 12, 2002 Press Release is not Forward–Looking.

The excerpt of the March 12, 2002 press release quoted in the complaint contains statements of historical and present fact concerning IBM's actions in the recent past and Compuware's response on that day. Therefore, the March 12, 2002 is not entitled to protection as a forward-looking statement under the PSLRA.

b. Plaintiffs Have Adequately Alleged the Requisite Scienter.

▇▇▇ Plaintiffs assert that this press release is actionable because Compuware deliberately downplayed IBM's products' competitive threat to Compuware's future profitability and its impact on Compuware's current bottom line. Plaintiffs also argue that Compuware mischaracterized IBM's actions as a mere attempt to enter the market and IBM's products as new, while being fully aware that IBM's entry into the market had occurred eighteen (18) months prior and was not speculative. Compl. ¶ 57. Plaintiffs have alleged that Defendants misspoke deliberately, far exceeding the minimum requirement that Plaintiffs allege recklessness for statements that are not forward-looking.

Plaintiffs are entitled to the most plausible of competing inferences. *Champion,* 346 F.3d at 673. It is simply implausible that Defendants were wholly unaware of the scope of the breakdown in its relationship with IBM at the time that the above-examined statements were made. Thus, Plaintiffs' allegations have created a strong inference that Defendants had actual knowledge that the relationship with IBM was increasingly ruptured and chose to omit or misstate that material information in public documents. *Comshare,* 183 F.3d at 550. To the extent that Plaintiffs' averments have not adequately stated the requisite scienter, Plaintiffs are entitled to an opportunity to amend the consolidated complaint and may amend within 20 days of this order. *Comshare,* 183 F.3d at 547–48.

C. Causation

▇▇▇ Defendants claim that even if it could otherwise prove the elements of a securities fraud claim, Lead Plaintiff Houston Municipal Employees Pension System ("HMEPS") would not be able to prove loss causation because HMEPS did not own any Compuware stock on March 12, 2002, the date the lawsuit against IBM, the trigger event for Plaintiffs' alleged injuries, was filed. For loss causation to exist, it is not necessary that there was a disclosure and that a subsequent drop in market price actually occurred. *See, Gray v. First Winthrop Corp.,* 82 F.3d 877, 886 (9th Cir.1996). Further, whether loss causation actually exists is an issue of fact inappropriate for resolution on a motion to dismiss, but rather the appropriate inquiry is whether Plaintiffs have alleged facts establishing both "transaction causation" and

"loss causation." *See, D.E. & J Ltd. v. Conaway,* 284 F.Supp.2d 719, 746–47 (E.D.Mich.2003)(citing *Campbell v. Shearson/American Exp. Inc.,* 829 F.2d 38, 1987 WL 44742 (6th Cir.1987)(unreported decision)).[6]

■ Here, the relevant injury occurred at the time of the transaction and is based on losses sustained until the announcement of and filing of the March 12, 2002 lawsuit against IBM. Plaintiffs have specifically alleged that "they would not have purchased or otherwise acquired their Compuware common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid." Compl. at 37. The court finds that HMEPS should have the opportunity to establish causation at a later point in this litigation, regardless of the amount of stock owned when the action against IBM was filed, because HMEPS has sufficiently pleaded that the securities' price was inflated on the dates of purchase due to Defendants' misrepresentations. Therefore, Plaintiffs have sufficiently alleged both transaction and loss causation as required in order to survive dismissal.

**D. Statute of Limitations**

■ Defendants allege that Plaintiffs' claims based on Compuware's statements made before 1999 are barred by the PSLRA's three (3) year statute of limitations period. 15 U.S.C. § 78i(e). Defendants also allege that Plaintiffs' claims against Defendants Karmanos and Chappell are time barred because they were filed more than one (1) year after Plaintiffs had inquiry notice of those claims. Plain-

tiffs counter that the Sarbanes–Oxley Act applies to actions filed after July 30, 2002. 28 U.S.C. § 1658. That statute extended the limitations period to two (2) years from discovery of the misstatements and five (5) years from the violation. *Id.* The Sarbanes–Oxley Act's two (2) year limitations period applies here. The court also finds that the relevant date with which Plaintiffs are charged as having discovery notice is March 12, 2002, the day when Compuware filed suit against IBM and disclosed to the relevant market, its shareholders. Inasmuch as Plaintiffs' filed the initial complaint in this lawsuit on September 20, 2002, Plaintiffs' Complaint is not time barred.

## IV.

### Conclusion

Contrary to the assumptions underlying Defendants' arguments, the relevant issue here is not what Plaintiffs can prove, but rather whether what they have alleged creates a plausible inference that Defendants acted or spoke with the requisite state of mind. *Comshare,* 183 F.3d at 548 ("[T]he PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss"). The PSLRA "aims to proscribe 'knowing or intentional misconduct,'" not to defeat meritorious claims at the pleading stage. *Id.* In fact, in this instance, it is hard to imagine a complaint that could better withstand a motion to dismiss. The court finds that Plaintiffs have submitted a well-crafted, well-pled complaint, stating sufficient

---

6. The *Campbell* court explained that pleading causation is a bifurcated process:
 The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate,

way responsible for his loss. The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. *Campbell, supra,* 1987 WL 44742 at *2.

facts to create a plausible inference that Defendants knowingly misstated or omitted material information. Therefore, Defendants' Motion to dismiss must fail.

### V.

*Order Denying Defendants' Motion to Dismiss, in Part, and Granting Defendants' Motion to Dismiss, in Part*

The court having reviewed the file in this matter, having heard oral arguments, and otherwise being fully advised in the premises; now, therefore,

**IT IS ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint is hereby DENIED, in part, and GRANTED WITHOUT PREJUDICE, in part.

**IT IS SO ORDERED.**